Filed 11/30/21  P. v. Long CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>MARK HERBERT LONG,<br><br>      Defendant and Appellant. | C090578<br><br>(Super. Ct. No. 18FE000521) |

Defendant Mark Herbert Long appeals from his conviction for the first degree murder of his wife Susan Roberts (the victim).  He argues the trial court erred in (1) denying his *Marsden*[1] motion and (2) admitting graphic photographs into evidence. We will affirm the judgment.

---

[1]     *People v. Marsden* (1970) 2 Cal.3d 118.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant and the victim married in 2015. By 2017, the victim was unhappy and told one of her friends in November of that year that she wanted to leave defendant. She was concerned about defendant's drinking.

On January 6, 2018, the victim and defendant failed to show up to a scheduled dinner at a friend's house. The next day, after unsuccessfully trying to reach the victim and defendant, the friend and her fiancé went to the victim's home to check on her but no one answered the door. The friend and her fiancé returned later with additional companions. They eventually discovered that defendant was in the home but he refused to let them in. One of the friends noticed it smelled like "death," and he knew the victim was dead. Scared, they called the police.

Police arrived and knocked on the door, but defendant did not respond. Officers noticed the rear sliding glass door was shattered, and they saw defendant moving in the house. The SWAT team arrived and eventually entered the home. Officers found defendant in the front bedroom, sitting on the bed with his dog. He later told police he could not remember anything. Police later reviewed defendant's phone records and found the last activity was a photograph taken just after midnight on January 4 showing the victim lying in bed.

After entering the home, police found the victim dead in the kitchen, lying face down with her legs cut off above the thigh. There was blood on the kitchen countertop, cabinets, and floor. Near the victim's head, police found a blood-soaked towel and a garbage bag containing two human legs. There were socks on the feet and a small piece of pajama bottoms near one of the thighs. Also in the kitchen were clothing, an ax, a cordless saw with blood on the blade, leather work gloves with the name "Mark" and the initials "M.L.," scissors with blood, rubber cleaning gloves with blood, a cutting board, a circular saw, and a saw blade. A bag of saw blades also was found in a bedroom, and just outside the bedroom was a drywall saw. Another saw was found in the garage.

2

The forensic pathologist testified that the victim had likely been dead for approximately two days before the police found her. She had injuries on her hands consistent with defensive wounds. She also had 11 chop wounds (i.e., sharp and blunt force injuries) on her head, including multiple skull fractures and brain injuries. Some of these wounds were fatal.

At trial, defendant testified he killed the victim in self-defense. He explained they had argued for a few days before the killing, and the victim said their marriage was over. Then, early in the morning on January 4, 2018, defendant drank beer and vodka and eventually fell asleep on the couch while watching television. He awoke to find the victim standing nearby, asking him to leave. Defendant refused, and the victim grabbed a knife from the kitchen and came toward him. Defendant moved to his right, got off the couch and tripped over a box, which caused him to fall through a window, but the victim continued to approach and slash at him with the knife. He eventually grabbed a nearby hammer and hit her in the shoulder. Defendant then followed her to the kitchen and hit her in the head with the hammer repeatedly because she "wouldn't stop." The victim fell face down and appeared dead. Defendant said he was too scared to call the police, so he drank "[a] lot" of alcohol and tried to sleep.

On January 5, defendant decided he needed to cut off the victim's legs so he could dispose of her body. He tried various methods, including a knife, an axe, and several different saws. He eventually was able to amputate her legs after buying a new saw at a local hardware store. The next day he decided this was "madness" and "has to stop." He kept drinking but did nothing more to the body.

Defendant was charged with first degree murder. (Pen. Code, § 187, subd. (a).) It was further alleged defendant personally used a deadly and dangerous weapon while committing the crime. (Pen. Code, § 12022, subd. (b)(1).)

In August 2019, a jury found defendant guilty of first degree murder and found the deadly weapon allegation to be true. In October 2019, the trial court sentenced defendant

3

to 25 years to life, plus one year consecutive for the deadly weapon allegation. The trial court also imposed various fines and fees.

DISCUSSION

I

Defendant contends reversal is required because the trial court erred in denying his requests for new counsel. According to defendant, he and counsel were embroiled in an irreconcilable conflict such that ineffective representation was likely to result. Defendant notes that during the hearing, he argued his counsel had not adequately met with him and failed to provide him with requested discovery. Defendant also questioned counsel's qualifications and claimed counsel did not have experience with murder trials.

Defendant further argues his counsel breached his ethical duty by "drawing adverse facts to the court's attention and arguing against [defendant's] interests." According to defendant, his counsel mocked his self-defense theory and "refused to argue it to the jury." In addition, counsel told the court defendant was "extremely difficult" and accused defendant of manufacturing the *Marsden* request to delay the trial.

A. *Additional background*

1. *August 12, 2019 hearing*

i. *Defendant's contentions during the* Marsden *motion*

Defendant brought his first *Marsden* motion on August 12, 2019, the first day of trial proceedings. During the in camera hearing, defendant complained his counsel had only visited him approximately 10 times during the prior seven months, and it was not enough. Even when his counsel visited, defendant felt they did not spend enough time together. During the most recent visit, counsel gave defendant a copy of the in limine motions to review and informed defendant he was going on vacation. When counsel returned, he spent only five minutes with defendant and said he would not be in court. Defendant felt like everything was last minute with his counsel.

4

Defendant also was frustrated because his counsel arranged for trial clothing rather than coordinating with his family to get clothing, as defendant had requested. Counsel had also failed to request a change of venue, as defendant requested.

Counsel sent a first-year law student to meet with defendant. Although they spent a lot of time together, defendant did not find their meetings productive. The law student would bring DVD's and other things to review, but they would not play on the machines at the jail. One time, she did not show up as scheduled because she forgot her driver's license and was unable to get through security.

Defendant complained his counsel had not adequately looked for exculpatory evidence. For example, counsel had failed to obtain e-mails from the victim or cell phone records from defendant and the victim, even though defendant had asked for them. Defendant felt his counsel was also confused by the phone records, since the time zones were different between his and the victim's phones. Defendant wanted to see all the potential evidence, especially the few months before the killing, because there might be something exculpatory.

In addition, defendant suggested his counsel had never tried a murder case before, let alone a high stakes first degree murder case. According to defendant, his counsel told him, "I don't know what to do." Counsel also told defendant his "statements about the facts of my case are ridiculous and that I'm crazy and that he knows more about my case than I do." Counsel had recently gotten some of the facts mixed up, and defendant felt this showed his counsel did not understand his case. In addition, at one point, defendant said he should have just pleaded guilty, and his counsel "was almost like, 'Yeah, you might as well.'" In sum, defendant was "frustrated," and felt their relationship had deteriorated "way beyond a clash of personalities."

ii.     *Defense counsel's response*

Defense counsel explained he had been a lawyer since 1992. For his first 15 years he ran a private practice focused on criminal, dependency, and delinquency. He

5

supervised 10 or 11 attorneys. He began working at the public defender's office in 2006, and had worked there ever since. At the time of the hearing, he was the most senior attorney in the trial division. He did not keep track of the number of trials he had done over the past 27 years, nor his win-loss percentage (although he did state that it was "not good").

Counsel had met with defendant at least 10 times. He also read each of the more than 60 letters defendant sent to him, cataloguing them in a two-inch binder. The law student had met with defendant for over 25 hours and helped show him the 45 different discs and thumb drives of evidence in the case.

Counsel had tried to see defendant twice the previous week but had to leave because defendant's "behavior became out of control," making the meetings "not productive." Defendant berated his counsel and had emotional outbursts, even using his cane to beat the door. Counsel was so unsure of how defendant would behave that he even prepared a motion to have defendant shackled during the trial. Although counsel had spaced his visits by a few days to "give him a couple days to mellow out," defendant was still "unable to control his emotions and stormed out of the room." At one point, counsel described defendant as "extremely difficult." In sum, even though counsel had tried to see defendant before trial, defendant was "unwilling and unavailable to do that."

Counsel explained he had prepared with defendant for trial. For example, he had asked defendant to review and comment on his draft in limine motions and statement of facts. He also had met with defendant for two hours regarding the trial readiness conference and to go over the evidence. Counsel also had received and reviewed all 2,000 pages of discovery, including the phone records. He admitted he was confused about the different time stamps on the calls. Defendant had also seen all the phone records. Counsel had hoped to discuss the various texts sent by the victim to other witnesses, but defendant was "unable or unwilling to speak with [him] about strategy on

6

that." Defendant had also been given the opportunity to review other evidence with the intern, including the e-mails, but defendant had instead "rant[ed] for two hours."

Counsel reiterated that there was no indication this was exculpatory evidence since the quarrel that led to the killing was sudden. Defendant told counsel the argument arose in the middle of the night, and the victim approached defendant with a knife. Defendant responded with a hammer, and the victim died. Given that the victim was "physically disabled, unarmed, and smaller than [defendant]," counsel "would never in a million years say this was a preplanned murder" attempt by the victim. Counsel acknowledged defendant might testify otherwise, but counsel preferred to avoid the argument because it was "not plausible" and would cause him to lose credibility with the jury.

Regarding the e-mails, counsel tried to show them to defendant, but they were in an unusable format. Nevertheless, counsel had reviewed the most recent ones and concluded they were not exculpatory or otherwise relevant. Defendant told counsel he wanted to argue self-defense based on the victim suddenly attacking him with a knife when they quarreled in the middle of the night. There was no indication the victim had a prior plan to murder defendant. Under the circumstances, counsel did not feel it necessary to review the older e-mails, especially since he could simply ask the witnesses who knew the victim if they had received any e-mails where she threatened to harm defendant.

In counsel's opinion, defendant was trying to "manufacture a continuance" because defendant wanted to avoid trial. Counsel noted that defendant had previously requested two other *Marsden* hearings. The first time, defendant dropped it. The second, defendant failed to appear.

In sum, counsel advised the court he was "prepared" and "ready to go." He had worked late and on the weekends, and he had informed defendant of new developments in the case, including the amended information. Counsel also had the knowledge from

7

defendant's prior lawyer, who worked in the same office as counsel and had met weekly with defendant for nearly a year before he was removed to change assignments.

The trial court stated that to the extent there were conflicts between defendant's statements and those from counsel, the trial court believed counsel. The trial court found counsel had properly represented defendant and "would continue to do so." Although there might be some personality conflicts, the court did not find there was such a breakdown in the relationship that counsel could not continue to properly represent defendant. The trial court advised defendant to cooperate with counsel.

### 2. *August 15, 2019 hearing*

Defendant again asked for a *Marsden* hearing on August 15. During the in camera hearing, defendant complained his counsel had not been to visit him or even talked to him during trial breaks. Defendant also said his counsel refused to explain what he planned to say during opening argument. He then asked counsel not to give an opening statement. Counsel disagreed, and still refused to tell defendant what he planned to say. Defendant was concerned, stating, "This is my life."

The court responded that it was common for the defense to reserve the opening statement. In addition, the court had given defendant a copy of the calendar.

Counsel stated he was prepared for trial and reminded the court that when he tried to visit defendant the week before, defendant had twice thrown him out and refused to speak with him. Defendant had also been out of control emotionally and beaten the walls with his cane. Even during the hearing, defendant interrupted counsel. Counsel stated he knew defendant's defense and understood what defendant would say on the stand. Counsel had reviewed the draft direct examination and cross-examination questions drafted by defendant, but felt he was not required to use them.

Counsel said he had a general idea of what he would say during opening statement but, as a practice, he did not rehearse. Counsel offered to share his plan with defendant, and defendant responded that was all he wanted.

8

The court agreed to delay opening statements until after lunch to allow defendant to speak with counsel. It asked defendant to avoid interrupting his counsel and allow him to "communicate with you." The court stated it would "treat this as a misunderstanding" and a withdrawal of the *Marsden* motion.

B.    *Applicable law and analysis*

A trial court must grant a defendant's *Marsden* motion for new counsel only if " 'the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599.)

We review a trial court's denial of a *Marsden* motion for abuse of discretion, and we will not disturb the ruling " 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " (*People v. Taylor, supra*, 48 Cal.4th at p. 599.) "[T]actical disagreements between a defendant and his attorney or a defendant's frustration with counsel are not sufficient cause for substitution of counsel." (*People v. Streeter* (2012) 54 Cal.4th 205, 231.) In addition, "the number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence." (*People v. Silva* (1988) 45 Cal.3d 604, 622.)

None of defendant's complaints indicated that he and counsel were embroiled in such an irreconcilable conflict that ineffective representation would likely result. Whatever personal differences defendant had with defense counsel, counsel was experienced in criminal law, and he was "prepared" and "ready to go" to trial. He was familiar with all 2,000 pages of discovery and defendant's argument that he acted in self-defense. Counsel had also worked extensively with defendant to prepare for the trial, despite defendant's emotional outbursts. He had met with defendant at least 10 times, and he had evaluated each of defendant's more than 60 letters to him. Counsel's law

9

student also had met repeatedly with defendant to review the evidence. Although counsel was unable to provide defendant with some of the victim's older e-mails due to formatting issues, these e-mails were not relevant because defendant told counsel that he wanted to argue he killed his wife in self-defense during their sudden argument. Even if counsel's explanations of the relevance of the older e-mails suggested to the court that defendant would not have a strong argument that the wife planned to murder him, it was not improper for counsel to provide context as to why he had not provided the evidence that defendant was now requesting.

To the extent defendant asserted during the hearing that counsel had mocked his self-defense theory, refused to argue his preferred theory of the case, or suggested he should have pleaded guilty, counsel responded he was ready for trial, familiar with the evidence, and understood defendant's defense and what defendant would say on the stand. It was not unreasonable for the trial court to find counsel more credible than defendant. Moreover, during the second hearing, defendant appeared satisfied when the trial court granted him time to discuss opening argument with counsel, and defendant did not object when the trial court said it would treat the *Marsden* motion as withdrawn. Under the circumstances, we find no abuse of discretion.

II

Defendant next argues the trial court abused its discretion and violated his Fifth, Sixth, and Fourteenth Amendment rights in admitting two photographs from the crime scene showing the victim's severed legs. According to defendant, the photos were irrelevant and introduced solely to inflame the jury, especially since the prosecutor "drew the jury's attention" to the photos during closing argument. He notes he admitted during testimony that he dismembered the victim's body after her death because he believed he had to dispose of it. Given that he was only charged with murder, argues defendant, the only issues before the jury were whether he committed a homicide and, if so, what type, meaning the photographs did not tend to prove or disprove any disputed issue and were

10

inadmissible under Evidence Code section 350.[2]  Defendant further argues the prejudicial impact greatly exceeded the photos' limited probative value and therefore should have been excluded under section 352.  We disagree.

A.    *Additional background*

During their investigation, police took video and photographs of the scene before marking potentially important evidence with placards.  Another set of photographs was taken after the evidence placards were placed.  The two sets of photographs were nearly identical, except that there was no photo of the severed legs in the set with the placards.  The video also did not show the legs.

The prosecution sought to introduce the photos and the video.  Defense counsel objected to introducing any of the photographs, but tentatively agreed to introducing the video and the evidentiary photographs with the placards.  The prosecutor also asked the court to admit two photos from the other set that showed the severed legs, since the video did not show them.

The court, which had looked at the two photos, found them admissible.  The court reasoned that the prosecution intended to rely primarily on the video to show the crime scene but wanted to use the two photos to show evidence that was not on the video.  The court explained:  "To a certain extent all homicide photos are graphic, gruesome just by the nature of the offense and by the nature of the photographs.  And although photographic evidence is sometimes cumulative of testimonial evidence.  That fact does not require[ ] its exclusion because the photographic evidence could assist the jury in understanding and evaluating the testimony.  [¶]  And it is just a factor to consider."  The court found the probative value outweighed any probability of substantial danger of undue prejudice, especially since the court intended to voir dire the jury about the

_____

[2]    Undesignated statutory references are to the Evidence Code.

"graphic nature of some of the evidence." Although this would not "completely inoculate them," at least the jury would be prepared.

During closing argument, the prosecutor described the scene of the victim's death and reminded the jurors that the two photos showed (1) the bag containing the victim's legs and (2) the legs. "That's what [ ] defendant did to her," she argued. She also argued she had shown so many photographs of the scene because it showed how defendant had attacked the victim in a "well-planned out ambush," rather than in self-defense. The photos also showed the crime scene was "very clean," indicating defendant had gone to great lengths to "contain this crime scene." The prosecutor argued defendant showed consciousness of guilt by cutting off the victim's legs.

B. *Analysis*

The trial court may exclude relevant, otherwise admissible evidence if it creates a substantial danger of prejudicing, confusing, or misleading the jury, or would consume an undue amount of time. (§ 352.) As courts have explained, the "prejudice" in section 352 refers to evidence that " 'uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.' " (*People v. Scheid* (1997) 16 Cal.4th 1, 19 (*Scheid*).) Photographs of victims in murder cases are always disturbing, but they need not be excluded unless they are "unduly gory or inflammatory." (*Ibid.*) For example, it may be necessary to exclude photographs that depict "a close-up view of the victims' wounds," a "revolting portraiture displaying horribly contorted facial expressions," badly decomposed bodies, or bodies disfigured during autopsy. (*Id.* at pp. 19, 20.)

We review a trial court's ruling to admit or exclude evidence for abuse of discretion (*People v. Ledesma* (2006) 39 Cal.4th 641, 705), and we will not disturb a trial court's exercise of its discretion under section 352 " 'unless the probative value of the photographs clearly is outweighed by their prejudicial effect.' " (*Scheid, supra*, 16

Cal.4th at p. 18.) Admission of evidence violates federal due process "only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

Here, defendant claimed he killed the victim in self-defense, while the prosecution asserted that he attacked her. Despite defendant's contentions, the photographs were relevant to the prosecution's case because they cast doubt on defendant's theory of self-defense by suggesting defendant was conscious of his guilt and sought to amputate the victim's legs and dispose of her body. (See *People v. Anderson* (2018) 5 Cal.5th 372, 391 ["[e]vidence showing consciousness of guilt . . . is generally admissible within the trial court's discretion"]; see also *People v. Butler* (1970) 12 Cal.App.3d 189, 193 [" '[a]ny conduct of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible' "].)

In addition, the trial court did not abuse its discretion under section 352. The two photographs were not unduly prejudicial because they were not unduly gruesome. In addition, they were the only visual evidence of the severed legs and were shown together with the video and other photos of the crime scene. Although the prosecutor mentioned the two photos during her closing argument, she did so only briefly and as part of her overall argument that the crime scene indicated defendant planned to murder the victim and exhibited consciousness of guilt.

Moreover, the photographs were not cumulative merely because the forensic pathologist testified about the victim's injuries and cause of death, or because defendant testified that he dismembered the victim's body. As courts have explained, a prosecutor is not obliged to merely present evidence via witness testimony, and a jury is " 'entitled to see how the physical details of the scene and the bod[ies] supported the prosecution theory.' " (*Scheid, supra*, 16 Cal.4th at p. 16.)

Given our conclusions, we also reject defendant's argument that the admission of the two photographs rendered the trial fundamentally unfair in violation of defendant's federal constitutional rights.

13

DISPOSITION

The judgment is affirmed.


                                                            KRAUSE            , J.


We concur:


         MURRAY          , Acting P. J.


         RENNER          , J.